UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ALEXANDER A. STRATIENKO, M.D.          )
                                       )
        Plaintiff,                     )
                                       )        Case No. 1:07-CV-258
v.                                     )
                                       )        Chief Judge Curtis L. Collier
CHATTANOOGA-HAMILTON COUNTY            )
HOSPITAL AUTHORITY and MEL             )
TWIEST, M.D., individually and in his  )
official capacity as Chief Medical Officer of )
Chattanooga-Hamilton County Hospital   )
Authority, V. STEPHEN MONROE, JR.,     )
M.D., MITCHELL L. MUTTER, M.D.,        )
DANIEL F. FISHER, M.D., and NITA       )
SHUMAKER, M.D.                         )
                                       )
        Defendants.                    )

## MEMORANDUM

Before the Court is a lawsuit brought by a physician whose hospital privileges were

suspended. As is typical in many lawsuits of this type, this litigation has been costly and time-

consuming for all involved. By deciding the pending motions discussed in this memorandum, the

Court will be bringing to an end this litigation, at least in this Court.

Two types of motions are before the Court: (1) motions to dismiss pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure, filed by Defendants Dr. Daniel Fisher, Dr. Nita Shumaker,

and Dr. Mitchell Mutter (Court File No. 113), and by Dr. V. Stephen Monroe (Court File No. 219);

and (2) motions for summary judgment as to all of the individual Defendants, including the

foregoing Defendants plus Dr. Mel Twiest and Dr. Monroe (Court File Nos. 310, 312, 314, 316).

The Court has considered the memoranda of law filed with these motions, as well as the responses

1

(Court File Nos. 210, 326, 327, 330, 331), replies (Court File Nos. 217, 396, 397, 398, 400), and exhibits filed in support of the filings. The Court finds it most efficient to address these motions in one omnibus memorandum, rather than separately.

For the following reasons, the Court will **GRANT IN PART** Defendants' motion to dismiss as to all but Plaintiff Dr. Alexander A. Stratienko's ("Plaintiff") antitrust claims, and will **DISMISS** the non-antitrust claims against those Defendants. In addition, the Court will **GRANT** Defendants' motions for summary judgment and will **DISMISS** Plaintiff's federal and state constitutional claims and federal antitrust claims against all Defendants. The Court will **REMAND** the remaining state law claims to state court.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

The Court has explained this case's undisputed facts extensively in previous memoranda (*see, e.g.*, Court File Nos. 192, 230), and thus will recount only the most important facts here. The case arose from an altercation which took place between Plaintiff Dr. Alexander Stratienko and Dr. Monroe at Erlanger Medical Center ("Erlanger") on September 16, 2004.[1] After Plaintiff had publicly questioned Dr. Monroe's medical credentials to insert carotid stents, Dr. Monroe confronted Plaintiff while standing in the doorway of Erlanger's break room, demanded Plaintiff stop questioning his training, and threatened to sue Plaintiff. As Plaintiff exited the room past Dr. Monroe, he either—depending on which side tells the tale—violently shoved Dr. Monroe out of the

---

[1] As this Court has previously held, Erlanger is a political subdivision of the state of Tennessee, and the office of its trustees is an independent governmental entity. *Ketron v. Chattanooga-Hamilton County Hosp. Auth.*, 919 F. Supp. 280, 283 (E.D. Tenn. 1996) (citing *Chattanooga-Hamilton County Hosp. Auth. v. City of Chattanooga*, 580 S.W.2d 322 (Tenn. 1979)).

way, or lightly tapped him with three fingers of his left hand. The parties do seem to agree, however, that some form of physical contact took place, which Plaintiff initiated (Court File No. 6 Ex. B).

Dr. Monroe reported the incident to Dr. Twiest, Erlanger's chief medical officer, who initiated a peer review. Approximately an hour and a half after the incident, Plaintiff was summarily suspended for thirty days, pursuant to Erlanger's medical staff bylaws (Court File No. 1 Ex. 1; No. 51 Ex. B). Plaintiff was not able to meet with Dr. Twiest until about noon the following day to give his version of the incident. When Dr. Twiest heard nothing about the incident that changed his mind, he upheld the suspension (Court File No. 312 Ex. E (Twiest dep. p. 180)).

On September 20, 2004, Plaintiff filed a complaint in state court, naming Erlanger and Dr. Twiest as defendants. The same day, Plaintiff obtained a temporary restraining order which prevented Erlanger from continuing Plaintiff's suspension pending resolution of the complaint (Court File No. 70 Ex. 3 (temporary restraining order); No. 113 Ex. B (original complaint)). On May 17, 2005, the Tennessee Court of Appeals ordered a stay of "all proceedings below" pending resolution of an interlocutory appeal (Court File No. 210 Ex. H). The stay lasted approximately two years, until the Tennessee Supreme Court lifted the stay on May 14, 2007 (*id.* Ex. M). On October 4, 2007, Plaintiff filed a Second Amended Complaint in state court adding Defendants Drs. Shumaker, Mutter, and Fisher (Court File No. 1 Ex. 1).[2] The Second Amended Complaint alleged Defendants conspired to restrain Plaintiff's practice in violation of state and federal antitrust laws, federal and state constitutional violations, state breach of contract violations, and state torts such as

---

[2]In 2005, Plaintiff applied for and was again granted staff privileges at Erlanger to run for two years (Court File No. 50 Ex. B). In early 2008, Plaintiff's privileges were renewed, conditioned on the outcome of this litigation (Court File No. 210 Ex. N).

3

tortious interference with business relationships.

Defendants unanimously removed the Second Amended Complaint to this Court on October 29, 2007 (Court File No. 1). Defendants filed their motion to dismiss on March 25, 2008, and their motions for summary judgment on December 14, 2008.

## II.    STANDARDS OF REVIEW

### A.    Motion to Dismiss

When reviewing a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff, *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998), accept the complaint's factual allegations as true, *Broyde v. Gotham Tower, Inc.*, 13 F.3d 994, 996 (6th Cir. 1994), and determine whether the plaintiff has pleaded "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). In deciding a motion to dismiss, the question is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support his claims. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). At the same time, bare assertions of legal conclusions are insufficient, and the "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). Unsupported allegations and legal conclusions "masquerading as factual conclusions" are insufficient to prevent a motion to dismiss. *Id.*

### B.    Motion for Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden rests on the movant to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court must view the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). It is the Court's duty to determine if the non-movant has presented sufficient evidence to raise issues of fact; however, the Court does not weigh evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

At the same time, the purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 (advis. comm. notes) (1963). The movant must demonstrate the absence of a genuine issue of material fact, but the non-movant is not entitled to a trial solely on the basis of its allegations. The non-movant must submit significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324. A scintilla of evidence is not enough; the non-movant must present evidence sufficient for a jury to reasonably find for its side. *Liberty Lobby*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The movant is entitled to summary judgment if the non-movant fails to make a satisfactory showing on an essential element of its case for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. It is the Court's role to decide if a fair-minded jury could return a verdict for the non-moving party, or if "the evidence . . . is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347

5

(6th Cir. 1994).

### III.     MOTION TO DISMISS

Defendants Dr. Fisher, Dr. Shumaker, and Dr. Mutter, and Dr. Monroe in his separate motion to dismiss ("MTD Defendants") argue Plaintiff's Second Amended Complaint should be dismissed as to them because the applicable statutes of limitation on the claims alleged against them have run, and because the Second Amended Complaint did not relate back to the original complaint such that the statutes of limitation were tolled (Court File No. 114). Specifically, the MTD Defendants argue Plaintiff was suspended on September 17, 2004; he filed his original complaint on September 20, 2004; but he did not file his Second Amended Complaint, which added the MTD Defendants, until October 4, 2007, over three years after the suspension. Plaintiff responds (1) the Second Amended Complaint encompasses the MTD Defendants' actions which extended into 2008; (2) the Tennessee Court of Appeals ordered a stay of all proceedings below, which renders the claims timely filed under Tennessee law and also invokes the federal doctrine of equitable tolling; (3) the MTD Defendants' participation in the allegations in the Second Amended Complaint was not discovered until the taking of the first deposition, which would render the filing of the Second Amended Complaint timely under the discovery rule; and (4) the MTD Defendants provided legally incorrect time periods for the statutes of limitation (Court File No. 210).[3]

_____

[3]In deciding the motion to dismiss by Defendants Erlanger and Dr. Twiest, the Court converted their motion to one for summary judgment because it presented matters outside the pleadings, per Fed. R. Civ. P. 12(d) (Court File No. 230, at 1). Here, though Defendants' motion to dismiss presents three exhibits, all of those exhibits *are* the pleadings—the Second Amended Complaint (Court File No. 113 Ex. A), the original complaint (Court File No. 113 Ex. B), and the first Amended Complaint (Court File No. 113 Ex. C), all of which were filed in state court. Accordingly, the Court applies Fed. R. Civ. P. 12(b) to Defendants' motion to dismiss.

A Rule 12(b)(6) motion to dismiss can be used to raise a statute of limitations defense "when it is apparent from the face of the complaint that the time limit for bringing the claim has passed." *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992) (citation omitted). Here, because the Second Amended Complaint adding the MTD Defendants was made prior to removal of the case to this Court, Tennessee's relation-back rules apply. *See Pac. Employers Ins. Co. v. Sav-A-Lot of Winchester*, 291 F.3d 392, 399–400 (6th Cir. 2002) (applying state court relation-back rules where the complaint was amended in state court prior to removal). Similarly, the Court applies Tennessee statutes of limitation to this action originally filed in Tennessee, under the *Erie* doctrine. *Guaranty Trust Co. v. York*, 326 U.S. 99, 110 (1945); *Consol. Rail Corp. v. Yashinsky*, 170 F.3d 591, 594 (6th Cir. 1999).

## A. Allegations of Continuing Misconduct

Plaintiff responds to the motion to dismiss by arguing that since the MTD Defendants have engaged in continuing wrongful conduct, extending into 2008, the events underlying the Second Amended Complaint are ongoing and hence not time-barred by Tennessee statutes. Plaintiff points to criticisms he has made of Erlanger, which he alleges have "resulted in the Defendants taking action to adversely impact Dr. Stratienko and his medical practice." He also alleges more recent wrongful conduct on the MTD Defendants' part, including that "Defendants Fisher and Monroe have continued to work to take Dr. Stratienko's patients," that an administrative hearing was set without notice to Plaintiff, that Plaintiff complained of a possible conflict of interest and was ignored, and numerous other incidents (Court File No. 210, at 7–9).

---

Separately, the Court reads the two motions to dismiss as presenting substantially the same arguments regarding the applicable statutes of limitation. Accordingly, the Court has considered Plaintiff's response (Court File No. 210) as responding to both motions.

7

Even if the Court can permissibly consider Plaintiff's evidence of alleged ongoing misconduct (and, as explained below, the Court doubts it can), the Court is less than convinced by the evidence Plaintiff has submitted. Even viewing the evidence in the light most favorable to Plaintiff, he alleges nothing more than several incidents with outcomes unfavorable to him. For example, Plaintiff points to a January 4, 2008 letter from James Brexler, President and CEO of Erlanger, which confirms Plaintiff's reappointment to the medical staff, as evidence Drs. Fisher and Monroe "continue to work to take Dr. Stratienko's patients" (Court File No. 210 Ex. N). This is inexplicable; the letter does not even mention Drs. Fisher or Monroe by name, much less implicate them in any "patient stealing." Similarly, Plaintiff submits a set of letters between himself and Dr. Fisher as further evidence of "patient taking" (*id.* Ex. T). One of these letters represents Dr. Fisher *turning over* a patient to Plaintiff for longitudinal followup. Another, written by Dr. Fisher, indicates Dr. Monroe will *continue* to evaluate kidney transplant patients for their cardiology care requirements, per an existing agreement, in the name of consistency and standardization of cardiac evaluations. Read even in the light most favorable to Plaintiff, it appears Plaintiff wanted to jump in to a pre-existing arrangement for cardiac patient referrals of which he happened not to be a part. This can hardly be construed as an attempt by Drs. Fisher or Monroe to take patients who somehow "rightfully" belonged to Plaintiff.

Plaintiff also refers to a letter to all members of Erlanger's medical staff signed by, among others, Dr. Shumaker, as an example of public criticism of Plaintiff despite the confidentiality required by the peer review process (*id.* Ex. L). The letter refers to a small group of physicians who opposed proposed changes to the medical staff bylaws, and who endorsed their own slate of candidates in an upcoming election. Because the letter stated its writers had "reason to believe that

this small group is sponsored by an individual whose personal battles with the valid peer review process have motivated the aggressive attempt to take over Medical Staff Leadership and its efforts," Plaintiff concluded this represented the MTD Defendants publicly criticizing him despite peer review confidentiality. Yet even construing the letter's contents most favorably to Plaintiff, the letter does not refer to him, but to a "small group of physicians" of which he may have been a part, and never mentions Plaintiff by name. More importantly, the Court can find nothing in the letter indicating a breach of confidentiality regarding any specific proceedings that took place during the peer review process. The letter merely states, at worst, Plaintiff had "personal battles with the valid peer review process." It says nothing about the content of discussions during that review process, or even what the outcome of that process was.[4]

Plaintiff, then, essentially cobbles together a series of events which have not gone his way, states these events began before filing his complaint, have continued into the present, and concludes the ongoing nature of these adverse events entitles him to disregard the statute of limitations on the underlying cause of action. From a legal perspective, this is an even more troubling part of Plaintiff's argument: it attempts to introduce vague evidence into the record to counter the MTD Defendants' motion, when instead the Court must determine whether, from the face of the pleading alone, the applicable statutes of limitation have expired. *Hoover*, 958 F.2d at 744. Though "the plaintiff may come forward with allegations explaining why the statute of limitations should be

---

[4]Plaintiff also points to a letter, written by him and dated June 6, 2004, as evidence Dr. Monroe and others sought to place a moratorium on carotid stenting, a procedure which, apparently, only Plaintiff performed at the time (Court File No. 210 Ex. C). But a June 2004 letter—written before the altercation between Plaintiff and Dr. Monroe even took place, and referring to a meeting three months before that incident—does not support an allegation that the MTD Defendants' alleged misconduct continued into 2008 in a sense relevant to the underlying incident: Plaintiff's summary suspension.

9

tolled," *id.*, the allegations must contain "more than labels and conclusions" and must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl.*, 127 S.Ct. at 1964–65 (internal citations omitted). The Second Amended Complaint refers to "other actions of Defendants" (Pl.'s 2d Am. Compl. ¶ 39) and uses the phrase "including but not limited to" (*id.* ¶¶ 43, 46), but if the Court were to accept these assertions, Plaintiff would be able to present nearly any allegation, regardless of its specificity, that Defendants engaged in wrongful conduct. This proves too much.

Based on the evidence submitted by Plaintiff in opposing the motion to dismiss—which the Court has considered even though a Rule 12(b)(6) motion tests a complaint's *legal* sufficiency—the Court finds that evidence insufficiently specific to support a conclusion of ongoing wrongdoing which would extend the period of conduct underlying the action. Further, the face of the Second Amended Complaint does not adequately support ongoing conduct by the MTD Defendants. Accordingly, any ongoing conduct by the MTD Defendants is an insufficient basis to toll the statutes of limitation on the Second Amended Complaint.

### B. Stay of Proceedings in State Court; Equitable Tolling

Plaintiff represents, and the Court takes as true, he filed a motion to compel on December 7, 2004, seeking "an order compelling the production of any and all records reflecting Dr. Stephen Monroe's peripheral vascular credentials." When that motion to compel was denied on April 21, 2005, Plaintiff pursued an interlocutory appeal (Court File No. 210, at 6). The Tennessee Court of Appeals granted permission to appeal on May 17, 2005, and stayed the proceeding below. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.2d 346, 351 (Tenn. 2008) (summarizing the lower court proceeding). The Tennessee Supreme Court resolved the interlocutory

appeal, thus lifting the stay, with its ruling of May 14, 2007.  *Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, 226 S.W.3d 280 (Tenn. 2007).  Plaintiff now contends because he could not pursue further action in the matter for nearly two years due to the stay, the statutes of limitation should be tolled under both Tennessee law and the federal doctrine of equitable tolling.

In support of his position, Plaintiff cites Tenn. Code Ann. § 28-1-109, which states: "When the commencement of action is stayed by injunction, the time of continuance of the injunction is not to be counted."  The Tennessee Supreme Court, however, has long limited § 28-1-109 to the named parties in a lawsuit, not third parties yet to be named.  Thus, notwithstanding the existence of a stay, the statute of limitations continues to run against those third parties.  *See Sigler v. Vaughan*, 84 Tenn. 346, 1886 WL 2142, at *2 (Tenn. 1886) ("It is settled that this [statute of limitations] section only applies to parties to the suit, and does not prevent the running of the statute in favor of third persons."); *Terrell v. Ingersoll*, 78 Tenn. 77, 1882 WL 4108, at *4 (Tenn. 1882) ("[T]he writ of injunction acts *in personam*, and is only operative between, and for the benefit of the parties to the suit in which it is sued out. . . . It can not be supposed that the Legislature intended to affect the rights of persons not parties to the litigation in which the writ issued, nor having any notice of the writ itself.").

Here, there is no dispute the Tennessee Court of Appeals' stay acted as an injunction preventing Plaintiff's further pursuit of the case.  But when Plaintiff filed his original complaint on September 20, 2004, he only included Erlanger and Dr. Twiest as defendants (Court File No. 113 Ex. B).  Plaintiff only added the MTD Defendants when he filed the Second Amended Complaint on October 4, 2007 (*id.* Ex. A).  That is, the MTD Defendants were not parties to the original complaint, and under *Sigler* and *Terrell*, the Tennessee Court of Appeals' stay did not stop the

running of the statutes of limitation as to them. Under Tennessee law, then, Plaintiff cannot rely on the state court stay to toll the statutes of limitation vis-à-vis the MTD Defendants.

As for Plaintiff's federal equitable tolling argument, that doctrine is applicable "only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control," and the federal courts are to use the doctrine sparingly. *Jurado v. Burt*, 337 F.3d 638, 643 (6th Cir. 2003) (citing *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560–61 (6th Cir. 2000)). Equitable tolling may be appropriate

> in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. However, we have generally been much less forgiving where the claimant failed to exercise due diligence in preserving his legal rights.

*Id.* (internal citations, quotations, and alterations omitted). The Sixth Circuit uses five factors in determining whether equitable tolling is appropriate:

> (1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim.

*Id.* (citing *Andrews v. Orr*, 851 F.2d 146, 151 (6th Cir. 1988)).

Here, Plaintiff is represented by counsel with long experience in both state and federal court. Plaintiff himself is a sophisticated individual with many years of training and education. It is highly doubtful Plaintiff or his counsel were unaware of the filing requirement, either on a notice basis or based on his constructive knowledge. Plaintiff offers no evidence he was diligent in pursuing his rights against the MTD Defendants, in that there is no indication he investigated potential claims against them in the nearly eight-month period between the filing of his original complaint and the Tennessee Court of Appeals' stay. Even after the stay was lifted, Plaintiff waited an additional five

months before adding the MTD Defendants to the Second Amended Complaint. Because of this delay, Plaintiff essentially used the last possible minute to add the MTD Defendants before what he thought was the deadline. This does not reflect diligence in pursuing Plaintiff's rights, and actually indicates Plaintiff was aware of the legal requirement of filing his claim and tried to avoid it, not that he was reasonable in his ignorance of that requirement.[5]

Given the above factors, and given the Court should apply the equitable tolling doctrine parsimoniously (and to circumstances more compelling than these), Plaintiff cannot succeed on the equitable tolling issue. Accordingly, Plaintiff lacks a basis under both state and federal law to have tolled the statutes of limitation due to the state court's stay of the proceedings.

### C. Discovery Rule

Next, Plaintiff contends that the very first deposition in this case was that of Dr. Fisher, taken October 21, 2004. Accordingly, argues Plaintiff, that was the first date in which the participation of Drs. Fisher, Shumaker, and Mutter could have been uncovered. Under Plaintiff's argument, this should serve as the date from which the Court makes statute of limitations decisions regarding the addition of the MTD Defendants to the Second Amended Complaint (Court File No. 210).

Generally, the discovery rule provides a cause of action accrues and the applicable statute of limitations begins to run when the injury occurs or is discovered or, in the exercise of reasonable care and diligence, should have been discovered. *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487, 491 (Tenn. 1975). The Tennessee Supreme Court has interpreted the Tennessee

---

[5]The Court does not consider the fourth factor, whether the MTD Defendants were prejudiced by the delay in filing, because "[a]bsence of prejudice is a factor to be considered only after a factor that might justify tolling is identified." *Jurado*, 337 F.3d at 644 (citing *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984); *Andrews*, 851 F.2d at 151).

13

discovery rule to toll the statute of limitations until a plaintiff discovers or, in the exercise of reasonable care and diligence, should have discovered "(1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty." *Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982). Tolling occurs where "facts about causation [are] in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *Craft v. Vanderbilt Univ.*, 18 F. Supp. 2d 786, 796 (M.D. Tenn. 1998) (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979)). Since *Foster*, however, Tennessee courts have sought to narrow the scope of the discovery rule by holding it only applies "in cases where the plaintiff does not discover and reasonably could not be expected to discover that he had a right of action" and only operates to toll the applicable statute of limitations "during the period when the plaintiff had no knowledge at all that the wrong had occurred and, as a reasonable person, was not put on inquiry." *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680–81 (Tenn. 1990) (citing *Hoffman v. Hosp. Affiliates, Inc.*, 652 S.W.2d 341, 344 (Tenn. 1983)).

Plaintiffs must do more than argue a complaint must be read in the light most favorable to them and be "construed as not precluding the possibility that they will be able to prove facts establishing their entitlement to relief." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008). "The obligation to plead facts in avoidance of the statute of limitations defense is triggered by the fact that 'it is apparent from the face of the complaint that the time limit for bringing the claim[s] has passed.'" *Id.* (quoting *Hoover*, 958 F.2d at 744). "The Sixth Circuit has adopted the view, at least in cases where the face of the complaint discloses a failure to file within the time allowed, that the plaintiff may come forward with allegations explaining why the statute of limitations should be tolled." *Id.* (citing *Hoover*, 958 F.2d at 744); *see also LRL Props. v. Portage*

14

*Metro Hous. Auth.*, 55 F.3d 1097, 1107 & n.6 (6th Cir. 1995) (rejecting the plaintiffs' state-law discovery rule argument, in a case under federal question jurisdiction, because the plaintiffs' complaint said "nothing more than that they did not become aware of" facts forming the basis for their suit until after the statutory deadline had passed). Tennessee law is in accord with that of the Sixth Circuit. *See Burk v. RHA/Sullivan, Inc.*, 220 S.W.2d 896, 901–02 (Tenn. Ct. App. 2006) (rejecting the plaintiffs' discovery rule argument where they did not indicate additional evidence showing an additional cause of action existed); *Steele v. Tenn. Jaycees, Inc.*, 1995 WL 623067, at *5 (Tenn. Ct. App. Oct. 25, 1995) ("The discovery rule was not meant to allow a party to delay filing his claim until after he has completed the process of discovering all the factors that affect its merits.").

In this case, Plaintiff was obligated to put forth facts on the face of his Second Amended Complaint demonstrating he had discovered new evidence in his depositions of Drs. Fisher, Shumaker, and Mutter, such that the statutes of limitation should have been tolled. On the Court's reading of the Second Amended Complaint, those facts are conspicuously absent. The Second Amended Complaint does include further allegations concerning (1) Dr. Fisher's communication of an allegedly peer review-protected conversation to Dr. Monroe (Pl.'s 2d Am. Compl. ¶ 17), (2) the alleged failure of Drs. Mutter and Fisher to recuse themselves from discussing the altercation with Dr. Twiest due to a "conflict of interest" (*id.* ¶ 21), and (3) that the MTD Defendants acted in concert in suspending Plaintiff's staff privileges (*id.* ¶¶ 38, 41). Yet nowhere in the Second Amended Complaint does Plaintiff explain *why* he could not have discovered these allegations without the depositions upon which he relies to extend the statutes of limitation. He does not claim Defendants hindered him from discovering this information, or that these facts were in Defendants'

control and otherwise undiscoverable by him. Simply put, Plaintiff had the opportunity to explain, in the Second Amended Complaint, why the necessity of taking additional depositions should have tolled the statutes of limitation—but he did not. It was thus proper for the MTD Defendants to move to dismiss on that basis, since motions to dismiss for failure to state a claim enable "defendants to challenge the legal sufficiency of complaints," including, naturally, what appears (or does not appear) on the complaint's face. *Mitchell v. McNeil*, 487 F.3d 374, 379 (6th Cir. 2007); *accord Swihart v. Wilkinson*, 209 F. App'x 456, 458 (6th Cir. 2006); *see also Westside Mothers v. Olszewski*, 454 F.3d 532, 541 (6th Cir. 2006) (noting that appeal from dismissal for failure to state a claim is concerned with sufficiency of the complaint).

Therefore, Plaintiff's attempted invocation of the discovery rule to toll the applicable statutes of limitation must also fail.

### D. Substantive Periods for Statutes of Limitation

Plaintiff contends "Defendants have wrongfully set forth the time periods for various statutes of limitations" (Court File No. 210, at 3). Plaintiff specifically identifies (1) his constitutional claims, (2) his breach of contract claims, (3) his civil conspiracy claim, (4) a defamation claim,[6] (5) his antitrust claims, and (6) his state tort claims as falling within the applicable statute of limitations for each type of action. The MTD Defendants counter each of Plaintiff's arguments (Court File No. 217).

### 1. Constitutional Claims

---

[6]Plaintiff concedes he "has not asserted, or attempted to assert, a discreet claim for defamation" (Court File No. 210, at 21). Thus, the Court will not consider this argument here, even though Plaintiff asserts "much of the conduct of Defendants which might considered [sic] defamatory has caused other damage" (*id.*).

16

As the MTD Defendants correctly point out, the statute of limitations for civil rights claims in Tennessee is one year. Tenn. Code Ann. § 28-3-104; *see also Kessler v. Bd. of Regents*, 738 F.2d 751, 754 (6th Cir. 1984) ("It is undisputed . . . that a one-year statute of limitations applies to civil rights cases arising in Tennessee."). Plaintiff appears to concede this, but relies on his earlier arguments to contend his constitutional claims should be maintained (Court File No. 210, at 12–13). Because the Court has already rejected Plaintiff's ongoing-injury and discovery rule arguments, the Court finds the Second Amended Complaint was untimely filed vis-à-vis Plaintiff's constitutional claims.

## 2.    Breach of Contract Claims

Defendant contends Plaintiff's Second Amended Complaint brought a claim for injury to his property—in the form of his practice and professional reputation—and therefore, the three-year limitation period of Tenn. Code Ann. § 28-3-105 should operate to bar his claim.[7] Plaintiff responds this is incorrect because his claim is centered on economic loss arising out of contract, which is governed by the six-year limitation period of Tenn. Code Ann. § 28-3-109(a)(3), thus rendering his Second Amended Complaint timely.[8]

Tennessee recognizes occupations, employment, and economic benefits resulting therefrom as property interests. "An individual has a property interest in his labor, and the right to work without unjustified interference. One who intentionally interferes with this right, causing the

---

[7]"The following actions shall be commenced within three (3) years from the accruing of the cause of action: (1) Actions for injuries to personal or real property . . . ." Tenn. Code Ann. § 28-3-105.

[8]"The following actions shall be commenced within six (6) years after the cause of action accrued . . . Actions on contracts not otherwise expressly provided for." Tenn. Code Ann. § 28-3-109(a)(3).

employee to be discharged, is liable in tort for the resulting damages." *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn. 1977).

"In Tennessee the applicable statute of limitations is determined according to the gravamen of the complaint rather than its designation as an action for tort or contract." *Keller v. Colgems-EMI Music, Inc.*, 924 S.W.2d 357, 359 (Tenn. Ct. App. 1996). That is, a court "must look to the plaintiff's declaration to see whether or not he is suing for damages arising out of a contract or for damages arising out of tort." *Id.* at 360 (quoting *Bland v. Smith*, 277 S.W.2d 377, 380 (Tenn. 1955)). "[R]egardless of whether a complaint sounds in contract, if the suit seeks to recover damages for injuries to the plaintiff's property, the applicable limitations period is three years . . . ." *Id.* at 359 (citing Tenn. Code Ann. § 28-3-105).

The *Keller* court explained the holding in a previous case, *Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727 (Tenn. Ct. App. 1980):

> [T]he plaintiff claimed that the defendant partnership failed to audit the inventory of a company professionally, causing the plaintiff to pay an excessive price for the corporate stock of such company. The Court held that such action was for ordinary money damages resulting from breach of contract, and thus, the applicable statute of limitations was the six year statute for contract cases rather than the three-year statute for actions involving injury to real or personal property. The Court noted that although the gravamen of the complaint was that the defendants overstated the value of the corporation in question, the "general tenor" of the complaint was that the defendants attempted to perform the contract in an unprofessional manner and more importantly, the property being audited *was not the plaintiffs* [sic] *at the time of breach*.

924 S.W.2d at 360 (emphasis in original) (citations omitted). The *Keller* court also observed "the major criterion in determining the gravamen of the action is the kind of damage alleged." *Id.* (citing *Harvest Corp.*, 610 S.W.2d at 729).

In this case, Plaintiff's Second Amended Complaint alleges several grounds for the summary

suspension. It was done "to further the economic interest of one or more of the Defendants and to interfere with the prospective economic interest of the Plaintiff" (Pl.'s 2d Am. Compl. ¶ 2f), and "in an attempt to damage the reputation of the Plaintiff in the community and to damage the Plaintiff's medical practice" (*id.* ¶ 2i). Some of the Second Amended Complaint's allegations indicate damage to a property interest in Plaintiff's practice and reputation: "[A] suspension of Plaintiff's Medical Staff privileges would result in . . . irreparable harm to Plaintiff's medical practice and professional reputation" (*id.* ¶ 25); "Defendants' actions in summarily suspending Plaintiff's Medical Staff privileges constitute an illegal restraint of trade" (*id.* ¶ 30). Others, however, pull more strongly for economic loss arising out of contract: "[T]o interfere with the contractual relations and the relationship of the Plaintiff with Erlanger" (*id.* ¶ 2g); "Plaintiff's membership as a physician with Medical Staff privileges at Erlanger grants Plaintiff certain contractual rights pursuant to the Medical Staff Bylaws, and imposes certain contractual obligations on Defendants" (*id.* ¶ 26).

Recall, however, *Keller*'s instruction that the "major criterion in determining the gravamen of the action is the kind of damage alleged." 924 S.W.2d at 360. Here, Plaintiff's damages requests are for "compensatory damages for the damage done to his reputation and his loss of business" (Pl.'s 2d Am. Compl. ¶ 13) and "compensatory damages for all other damage he has suffered, including based upon Defendants' tortious interference with Plaintiff's prospective or existing business relationships" (*id.* ¶ 14). He further alleges "Defendants' suspension of Plaintiff's Medical Staff privileges has damaged Plaintiff's medical practice and reputation, resulting in financial loss to Plaintiff" (*id.* ¶ 35); Defendants "wrongfully suspended Plaintiff's privileges at Erlanger, thereby damaging Plaintiff's reputation, causing Plaintiff financial loss and reducing competition" (*id.* ¶ 41);

"[t]he wrongful actions of Defendants with regard to their tortious interference with Plaintiff's existing and prospective business relationships has resulted in damage to Plaintiff" (*id.* ¶ 42); and Defendants had a common design to suspend Plaintiff and harm his client base to their benefit (*id.* ¶ 44).

While Plaintiff alleges economic loss of a sort, the loss did not arise from a pre-existing agreement—that is, a contract—but rather from Defendants' alleged interference with any such agreement that may have existed. Tennessee courts have consistently interpreted that type of interference as *tortious* in nature, implicating the three-year statute of limitations. *See, e.g.*, *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31 n.1 (Tenn. 2007); *Ladd*, 556 S.W.2d at 760 ("One who intentionally interferes with [the right to work without unjustified interference] is liable *in tort* for the resulting damages.") (emphasis added). The alleged interference, then, constitutes damage to any property interests Plaintiff may have held in his continued practice and business relationships, not to economic losses arising specifically from any contract to which Plaintiff may have been a party. This is squarely in line with dicta in *Keller*, which cautioned against an "argument predicated upon a narrow definition of the word 'injury' as used in the property actions three year statute, and the notion that torts, in the classic sense, result only in physical damage." 924 S.W.2d at 360 (quoting *Vance v. Schulder*, 547 S.W.2d 927, 932 (Tenn. 1977)).

Plaintiff's Second Amended Complaint also alleges "[t]he actions of Defendants . . . constituted procurement of the breach of Plaintiff's contractual rights with Erlanger in violation of Tennessee Code Annotated Section 47-50-109" (Pl.'s 2d Am. Compl. ¶ 46). Cases applying Tennessee law have interpreted § 47-50-109 to represent the codification of the common-law tort action for inducement to breach contract. *Int'l Union v. Auto Glass Employees Fed. Credit Union*,

858 F. Supp. 711, 724 (M.D. Tenn. 1994); *Koehler v. Cummings*, 380 F. Supp. 1294 (M.D. Tenn. 1971). Analogously, Tennessee courts consider fraud in the inducement of a contract a tortious "gravamen of the action." *Keller*, 924 S.W.2d at 360. Although the gravamen of the complaint determines the applicable statute of limitations, rather than the complaint's designation as an action in tort or contract, *id.* at 359, the Court find the conduct alleged in ¶ 46 of the Second Amended Complaint more closely resembles a Tennessee cause of action grounded in tort (and later codified by statute) than it does an action grounded in contract.

These reasons persuade the Court that the gravamen of Plaintiff's Second Amended Complaint is centered far more on Plaintiff's claim for damages to his property in the sense of his business and practice interests, than solely in economic losses to his "pocketbook" arising out of contract. *See Bland*, 277 S.W.2d at 379 ("This six-year statute of limitations is only applied in cases where the whole basis of recovery is sought on contract and no element of personal injuries is involved."). Accordingly, the Court finds the three-year statute of limitations of Tenn. Code Ann. § 28-3-105 applicable, making the breach of contract claim untimely filed.

### 3. Civil Conspiracy Claim

The MTD Defendants rely on the interpretation of the three-year statute of limitations in Tenn. Code Ann. § 28-3-105 as extending to civil conspiracy claims. *Budget Rent-A-Car of Knoxville, Inc. v. Car Servs., Inc.*, 469 S.W.2d 360, 362 (Tenn. 1971) ("Conspiracy is a tort and is subject to the running of the statute of three years."). Plaintiff opposes this by arguing the overt acts of the conspirators have continued into 2008, rendering this claim timely.

Here, however, both parties miss the mark because in Tennessee, "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons." *Foster Bus. Park, LLC v. Winfree*,

2009 WL 113242, at *16 (Tenn. Ct. App. Jan. 15, 2009) (citing *Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., LLC*, 461 F. Supp. 2d 629, 642–43 (M.D. Tenn. 2006)). This is because civil liability is, rather, a theory of liability which requires, for its existence, "an underlying predicate tort allegedly committed pursuant to the conspiracy." *Id.* (citing *Morgan v. Brush Wellman, Inc.*, 165 F. Supp. 2d 704, 721 (E.D. Tenn. 2001)). In *Swafford v. Memphis Individual Practice Association*, 1998 WL 281935 (Tenn. Ct. App. June 2, 1998), the Tennessee Court of Appeals applied the one-year statute of limitation from the underlying predicate torts to the plaintiff's civil conspiracy claim, because "[a] civil conspiracy . . . is neither a punishable offense standing alone nor a wrong capable of supporting a cause of action by its own weight," and hence "the procedural law applicable to the gravamen of the complaint applies to the conspiracy claim." *Id.* at *11 (internal citations omitted).

Accordingly, the Court does not decide the statute of limitations issue on the civil conspiracy matter with regard to a separate statutory provision, but rather with regard to the statutes of limitation applicable to the underlying substantive alleged torts.

### 4.    Antitrust Claims

The MTD Defendants argue the three-year rule for torts involving economic damage to property also applies to antitrust claims. Plaintiff counters that his federal antitrust claims fall within the Sherman Act's statute of limitations, and that the case cited by the MTD Defendants is inapposite for the statute of limitations on Plaintiff's state antitrust claims.

Under 15 U.S.C. § 15, private actors have a cause of action to enforce the Sherman Act's prohibition on restraints of trade, 15 U.S.C. § 1. Section 15 also provides a statute of limitations for that federal cause of action: "Any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action

accrued." 15 U.S.C. § 15b. Thus, the Sherman Act's cause of action has a four-year statute of limitations. Here, Plaintiff has correctly pointed out this law, as it makes his federal antitrust claims in the Second Amended Complaint timely, and the MTD Defendants do not challenge this in their reply. Thus, Plaintiff's federal antitrust claims will not be dismissed as time-barred, and the Court will address their merits at the summary judgment stage in Part IV below.

The MTD Defendants claim the three-year statute of limitations from Tenn. Code Ann. § 28-3-105 applies to Plaintiff's state antitrust claim because one state court has construed antitrust claims as analogous to tort actions. *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *2–3 (Tenn. Ch. Ct. Sept. 25, 1980) ("Although anti-trust actions are based upon statutes, it has been universally held that private anti-trust suits are actions sounding in tort. . . . This private anti-trust suit . . . is an action for injuries to personal property and is subject to the three year statute of limitation . . . ."). This Court, however, can find no other Tennessee cases adopting this holding, and the parties have not provided another one. The Court is highly reluctant to decide an unsettled area of state law in which only one state trial court has ruled in an unpublished, non-precedential opinion. For this reason, the Court will allow these claims to proceed to the summary judgment stage, where they can be evaluated on the merits under clearer state law principles.

### 5. State Tort Claims

As the Court noted above, claims for tortious interference with contractual relationships have a three-year statute of limitations. *Tigg*, 232 S.W.3d at 31 n.1. Plaintiff's only argument against this limitation is to invoke the discovery rule (Court File No. 210, at 23). However, the Court foreclosed this argument earlier, so the Court also considers Plaintiff's state tort claims in his Second Amended Complaint to be untimely filed.

23

### E.    Relation Back

Given Plaintiff's lack of compelling arguments opposing the MTD Defendants' motion to dismiss (save for those relating to his antitrust claims), the Court turns to their contention that the Second Amended Complaint adding them as parties did not relate back to Plaintiff's original complaint, hence failing to toll the statutes of limitation (Court File No. 114, at 3). Plaintiff does not answer the relation back issue in his response.

Under the Tennessee Rules of Civil Procedure, the addition of a party to a lawsuit only relates back to the filing of the original complaint (thus extending the deadline) if the party to be amended

> (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Tenn. R. Civ. P. 15.03. "Rule 15.03 requires more than merely that a potential new defendant be aware of the existence of the action prior to being made a party." *Rainey Bros. Constr. Co. v. Memphis & Shelby County Bd. of Adjustment*, 821 S.W.2d 938, 941 (Tenn. Ct. App. 1991). "A mistake within the meaning of Rule 15.03 does not exist simply because the party who may be liable for conduct alleged in the original complaint was omitted as a party defendant." *Id.*

Here, Plaintiff's Second Amended Complaint did not allege the MTD Defendants were added due to mistake—in fact, it never gave *any* reason why they were added. The MTD Defendants had no reason to know an action would have been brought against them but for a "mistake," and again, no mistake occurs just because Plaintiff omitted to add a party he should have named in the original complaint. Plaintiff's addition of the MTD Defendants in the Second Amended Complaint did not relate back to his original complaint, and did not toll the relevant

statutes of limitation.

**F.    Conclusion**

For the foregoing reasons, the Court will grant the MTD Defendants' motion to dismiss on statute of limitations grounds on all of Plaintiff's claims in the Second Amended Complaint except his antitrust claims.  The Court will evaluate the merits of the federal and state antitrust claims at the summary judgment stage in Part IV, below.


**IV.    MOTION FOR SUMMARY JUDGMENT**

Defendants have moved for summary judgment on Plaintiff's federal and state law claims. Many of Defendants' arguments overlap and incorporate each other by reference.  The Court addresses the immunity argument raised by Dr. Monroe first (Court File No. 317, at 6–7), then turns to the federal constitutional and antitrust claims raised by the remaining Defendants.

**A.    Dr. Monroe's Immunity Argument**

As a threshold matter, Defendant Dr. Monroe argues he is immune from suit for providing information to the medical staff committee which led to Plaintiff's suspension (Court File No. 317). He argues this immunity arises under the federal Health Care Quality Improvement Act, 42 U.S.C. § 11111 ("HCQIA"), and the Tennessee Peer Review Law, Tenn. Code Ann. § 63-6-219 ("TPRL"). Plaintiff counters Dr. Monroe is immune under neither law, as there is a genuine issue regarding whether Dr. Monroe "baited" Plaintiff into the September 16 altercation (Court File No. 330).

In ruling on a previous motion for summary judgment in this case, the Court summarized the TPRL thus:

> Under the Tennessee Peer Review Law, Tenn. Code Ann. § 63-6-219(d)(1), all
> hospitals, physicians, and hospital administrators and employees are immune from

liability for furnishing information to a peer review committee, and immune from damages resulting from any decision, opinion, or action rendered by such a committee. *See Eyring v. Fort Sanders Parkwest Medical Center, Inc.*, 991 S.W.2d 230, 235 (Tenn. 1999) (hospitals are included in the immunity afforded by the Tennessee Peer Review Law). Members of the peer review committee are presumed to have acted in good faith and without malice. Tenn. Code Ann. § 63-6-219(d)(3). The party seeking to overcome the immunity has the burden of proving bad faith and malice. *Id.* For summary judgment review, as here, the evidence is viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in that party's favor. *Eyring*, 991 S.W.2d at 236.

(Court File No. 230) (footnote omitted).

To promote full and good faith professional review activities in medical facilities, Congress in the HCQIA provided immunity from damages to professional review bodies, members, staff, and those who assist the review. *See* 42 U.S.C. § 11111(a)(1). However, to qualify for this immunity, a professional review action must be taken

(1) in the reasonable belief that the action was in the furtherance of quality health care,
(2) after a reasonable effort to obtain the facts of the matter,
(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).

Earlier in this case, the Court ruled that "[w]here an individual provides information to the review committee, but is not a member of the review committee, that person is immune from liability 'unless such information is false and the person providing it had actual knowledge of such falsity'" (Court File No. 230, at 9 n.6) (quoting Tenn. Code Ann. § 63-6-219(d)(2)). Whether that information was otherwise provided in good faith or with malice is immaterial. *See Ironside v. Simi Valley Hosp.*, 188 F.3d 350, 353 (6th Cir. 1999); *Logan v. Everett*, 2006 WL 223708, at *4 (Tenn.

26

Ct. App. Jan. 27, 2006). If such an individual qualifies for immunity under the TPRL, he would also qualify for immunity under the HCQIA, because the provisions of the two laws are "essentially identical." *Ironside*, 188 F.3d at 353–54.

Here, in responding to Dr. Monroe's motion for summary judgment on the immunity issue, Plaintiff points to incidents of alleged "baiting" which, he contends, call into question Dr. Monroe's good faith and lack of malice. As noted above, however, it is immaterial whether Dr. Monroe provided the information about the physical altercation—and it is worth remembering the parties do not dispute an unwanted touching occurred—out of subjective bad faith or malice. Moreover, even looking at the evidence Plaintiff cites, the Court cannot conclude any "baiting" rose to the level of malice when Dr. Monroe reported the touching, even viewing the evidence in the light most favorable to Plaintiff. The minutes of a meeting of Erlanger's Medical Executive Committee which discussed the September 16 incident (Court File No. 326 Ex. Q) refer to "some baiting," though it is unclear which of the two physicians committed this baiting. The minutes also reported a witness's impression that "there was hostility" in Dr. Monroe's voice when he confronted Plaintiff in the break room. Erlanger's medical staff Credentials Committee said it appeared "Dr. Monroe was inappropriate in bringing these issues up in a public setting. That may be problematic; however, it does not excuse Dr. Stratienko's response" (*id.* Ex. R). Even if those vague assertions constitute any malice subjectively felt by Dr. Monroe toward Plaintiff, or "baiting," they say nothing about the motivations with which Dr. Monroe reported the incident to members of the Medical Executive Committee—which are irrelevant anyway.

Therefore, because any malice would be irrelevant if it were present, and because the Court cannot find an issue of material fact regarding malice in Dr. Monroe's reporting the incident to the

medical staff, the Court finds Dr. Monroe provided information that was at least substantially true, *Ironside*, 188 F.3d at 353, to the Medical Executive Committee, given that both sides do not dispute Plaintiff made unwanted physical contact with Dr. Monroe. Accordingly, the Court concludes Dr. Monroe is immune from Plaintiff's claims under the TPRL and the HCQIA. The Court will dismiss any antitrust claims against Dr. Monroe.

### B.       Federal Constitutional Claims

As the Court ruled in Part III, Drs. Monroe, Mutter, Fisher, and Shumaker were dismissed from Plaintiff's federal constitutional claims on statute of limitations grounds. Therefore, this section addresses his constitutional claims with respect only to Drs. Twiest.

### 1.       Dr. Twiest

Defendants argue Plaintiff's claims under the United States Constitution should be dismissed on summary judgment because, in the Second Amended Complaint, Plaintiff did not plead his constitutional claims under 42 U.S.C. § 1983, the cause of action for asserting constitutional violations against state actors (Court File No. 311). Alternatively, Defendant argues even if Plaintiff did assert a § 1983 claim, it would fail on the merits.[9] Plaintiff responds by arguing he need not specifically plead under § 1983 to assert a colorable claim for constitutional violations (Court File No. 331).

Section 1983 provides a cause of action and, potentially, money damages against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any

---

[9]Dr. Twiest also raises qualified immunity, but the Court cannot find legal argument, either in his memorandum or in others he has incorporated by reference, supporting this defense. Accordingly, the Court will evaluate the merits of Plaintiff's claim.

rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state

a viable § 1983 claim, a plaintiff must allege that (1) he was deprived of a right, privilege, or

immunity secured by the federal Constitution or laws of the United States, and (2) the deprivation

was caused by a person while acting under color of state law. *Flagg Bros. v. Brooks*, 436 U.S. 149,

155–57 (1978); *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir. 1996).

The Sixth Circuit has addressed a case where plaintiffs failed to specifically allege a § 1983

violation, but instead pleaded only general allegations of constitutional deprivations. *Spadafore v.

Gardner*, 330 F.3d 849 (6th Cir. 2003). After noting the case was at summary judgment, and hence

the court was bound to consider material beyond the pleadings, *id.* at 852–53, the Sixth Circuit

nevertheless found neither the language of the complaint nor the plaintiffs' materials in response to

the motion for summary judgment clarified which substantive constitutional rights were violated,

*id.* at 853. The court further held "the pleading must contain something more by way of a claim for

relief than a bare averment that the pleader wants compensation and is entitled to it or a statement

of facts that merely creates a suspicion that the pleader might have a right of action." *Id.* (quoting

5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1216, at 163 (2d ed.

1990)). Finally, the court said it was reluctant to infer a constitutional violation from the factual

allegations when none was pled by the plaintiffs or addressed in opposition to the motion for

summary judgment. *Id.* Absent information which created a cognizable constitutional claim

notwithstanding the failure to plead § 1983, the Sixth Circuit affirmed the dismissal of all but one

of the plaintiffs' claims. *Id.* at 853–54.

Here, Plaintiff's Second Amended Complaint contains no reference to § 1983, though it does

state violations of constitutional rights: substantive due process, procedural due process, and equal

protection (Court File No. 1 Ex. 1). The Court must thus examine whether the materials filed in response to the Defendants' summary judgment motion, viewed in the light most favorable to Plaintiff, establish a claim for constitutional rights which could have been pleaded under § 1983. *Id.* at 852–53. The Court examines each of the stated constitutional violations in turn.

### a.    Substantive Due Process

Plaintiff claims Defendants' failure to grant Plaintiff a hearing before the summary suspension of his staff privileges violated his federal constitutional rights (Pl.'s 2d Am. Compl. ¶ 28). In a memorandum supporting summary judgment, the Defendants dispute Plaintiff's substantive due process interest (Court File No. 313).

The Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The 'freedom to choose and pursue a career, to engage in any of the common occupations of life, qualifies as a liberty interest which may not be arbitrarily denied by the State.'" *Parate v. Isibor*, 868 F.2d 821, 831 (6th Cir. 1989) (quoting *Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983) (internal citation and quotations omitted); *see also Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). The Sixth Circuit has held, however, that "while there may be a liberty interest in *entering* a profession of one's choosing, there is not a liberty interest in remaining free from regulation while engaged in that profession." *Benjamin v. Brachman*, 246 F. App'x 905, 919 (6th Cir. 2007) (citing *Parate*, 868 F.2d at 827, 831–32 (6th Cir. 1989)).

While *Benjamin* itself was unpublished, it applied published Sixth Circuit and Supreme Court law to circumstances similar to these. The plaintiff physician had his staff privileges revoked, owing at least partly to "strained relationships he had with his supervisors and colleagues stemming from several disputes," in addition to allegations of substandard care. *Id.* at 908–12. While the

30

*Benjamin* plaintiff received several days of hearings prior to suspension of his privileges, there was no indication, as here, a physical altercation took place. When the plaintiff's privileges were not reinstated, he sued the individuals involved in the decision, claiming, among other things, a violation of his substantive due process rights in practicing medicine and maintaining his medical privileges.

The Sixth Circuit upheld the district court's grant of summary judgment for the defendants. The Sixth Circuit distinguished the plaintiff's case from other cases, such as *Parate*, *Meyer*, and *Wilkerson v. Johnson*, where more serious violations of the right to an occupation of one's choosing took place, because the plaintiff in *Benjamin* was not barred from practicing medicine generally, only lost his privileges at one hospital, and was only subject to the duly-enacted regulations established by that hospital. 246 F. App'x at 919. Instead, the plaintiff's circumstances were more analogous to those in *Parate*, where the plaintiff professor's termination from one college did not deny him a career choice, as he could "pursue the teaching profession at any public or private university that request[ed] his services," and it was perfectly permissible to subject the plaintiff to regulation while he was engaged in his chosen profession. *Id.* (citing and quoting *Parate*, 868 F.2d at 827, 831–32).

Here, even viewing the evidence in the light most favorable to Plaintiff, his circumstances are much like the plaintiff's in *Benjamin*. Even though Plaintiff had his staff privileges suspended because of the altercation with Dr. Monroe, he did not permanently lose his ability to practice. Indeed, Plaintiff here fared better than the plaintiff in *Benjamin*—the next year, Plaintiff was reinstated to Erlanger, and always retained the ability to practice at other hospitals in the area (Court File No. 50 Ex. B (Pl.'s Mot. for Partial Summ. J.)). Erlanger's bylaws gave its medical staff the ability to summarily suspend physicians for conduct that could disrupt hospital operations or

31

jeopardize patient or employee safety (Court File No. 6 Ex. A ("Erlanger Bylaws") § 4.2-1).

Undoubtedly, a hospital must be allowed to exert control over the physicians to whom it accords

staff privileges, especially when those physicians are alleged to have been involved in an altercation.

*See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 (1984), *superseded by statute as*

*stated in Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 31 (2006) (recognizing "the hospital's

unquestioned right to exercise some control over the identity and the number of doctors to whom

it accords staff privileges").

The Court can find no other evidence which could amount to a cognizable substantive due

process violation. And,

> Rule 56 does not impose upon the district court a duty to sift through the record in
> search of evidence to support a party's opposition to summary judgment. . . . Rule
> 56 allocates that duty to the opponent of the motion, who is required to point out the
> evidence, albeit evidence that is already in the record, that creates an issue of fact.

*Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007) (quoting *Skotak v. Tenneco*

*Resins, Inc.*, 953 F.2d 909, 916 n.7 (5th Cir. 1992)). Accordingly, having found no grounds for a

substantive due process violation, the Court will grant Defendants' motion for summary judgment

on that claim.

### b.     Procedural Due Process

Plaintiff's Second Amended Complaint alleged a violation of procedural due process.

Defendant Dr. Twiest moves for summary judgment on that claim, arguing the decision to suspend

Plaintiff did not violate his due process rights (Court File No. 311, *incorporating by reference* Court

File No. 313, at 24–25). Plaintiff responds by arguing that because the Court already "found a

showing of malice" in its memorandum regarding Erlanger and Dr. Twiest's previous motion for

summary judgment (Court File No. 230, at 6–7), the Court has recognized Plaintiff's procedural due

process rights were violated (Court File No. 327, at 19–22).

The plaintiff in *Benjamin* also asserted a procedural due process violation for suspension of

his staff privileges.  The Sixth Circuit summarized the legal standard for procedural due process:

> The Due Process clause of the Fourteenth Amendment provides that "no State shall
> . . . deprive any person of life, liberty, or property, without due process of law."  U.S.
> Const. amend. XIV.  When considering a due process claim, courts undertake a two-
> step analysis.  The first step is to determine whether the plaintiff has a liberty or
> property interest entitled to due process protection.  *Bd. of Curators v. Horowitz*, 435
> U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).   ...
>
> Where a plaintiff is entitled to due process, a court must then determine whether the
> plaintiff was provided with sufficient notice and the opportunity to be heard "at a
> meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319,
> 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (internal quotation marks omitted) (quoting
> *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).  In
> *Mathews*, the Supreme Court set forth three factors that a court must weigh in its
> procedural due process analysis:
>
> > First, the private interest that will be affected by the official action;
> > second, the risk of an erroneous deprivation of such interest through
> > the procedures used, and the probable value, if any, of additional or
> > substitute procedural safeguards and finally, the Government's
> > interest, including the function involved and the fiscal and
> > administrative burdens that the additional or substitute procedural
> > requirements would entail.
>
> *Id.* at 335, 96 S.Ct. 893.

*Benjamin*, 246 F. App'x at 914–15.

Notice and an opportunity to be heard can be provided after the termination of a property or

liberty interest.  *See, e.g.*, *Mathews*, 424 U.S. at 349 (approving an evidentiary hearing after

termination of Social Security disability benefits, as long as "procedures be tailored, in light of the

decision to be made, to the capacities and circumstances of those who are to be heard"); *Mackey v.

Montrym*, 443 U.S. 1 (1979) (approving a hearing after a driver's license was suspended for refusing

to take a breathalyzer test).  In situations where it is impracticable or impossible to provide an

opportunity to be heard before the initial deprivation of a property interest, the Supreme Court has held the requirements of due process are met if the state provides an adequate post-deprivation remedy. *Parratt v. Taylor*, 451 U.S. 527, 537–43 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986); *Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir. 1994) ("In *Parratt v. Taylor*, the Supreme Court explicitly held that in some situations a state may satisfy procedural due process by providing 'some meaningful means by which to assess the propriety of the State's action at some time after the initial taking'.") (internal citations omitted).

Here, the parties do not dispute Plaintiff has a property interest in his continued medical practice, which was arguably impinged by the summary suspension. The question then becomes whether Dr. Twiest, acting for the medical staff, provided Plaintiff with sufficient process after he was suspended.

Viewing the evidence most favorably to Plaintiff, Dr. Twiest and others on the medical staff summarily suspended Plaintiff approximately an hour and a half after the incident with Dr. Monroe. Plaintiff was working throughout the evening of September 16, so the earliest he could discuss the incident with Dr. Twiest was about noontime on September 17 (Court File No. 6 Ex. C ¶ 14). At that meeting, Dr. Twiest gave Plaintiff the opportunity to explain his side of the story (Court File No. 312 Ex. E (Twiest Dep. p. 180)). When Dr. Twiest found Plaintiff's explanation insufficient, he upheld the suspension. Later, Dr. Shumaker wrote Plaintiff a letter informing him of the summary suspension and his "procedural rights" to request a hearing within thirty days (Court File No. 6 Ex. J). Dr. Twiest also informed Plaintiff of his rights to a hearing regarding the suspension (Court File No. 6 Ex. C (Twiest Aff. ¶ 18)). Instead of challenging the suspension at a hearing, Plaintiff filed this suit. In 2005, however, Plaintiff's privileges were reinstated (Court File No. 113

Ex. A), and were also renewed for two years in early 2008, conditioned on the resolution of this litigation (Court File No. 210 Ex. N).

On these facts, the Court concludes Plaintiff received adequate notice and an opportunity to be heard under the circumstances. Witnesses described a violent incident to Dr. Twiest and others conducting the investigation; a nurse who was present in the break room, Missy Fugatt, said she witnessed an altercation and saw Dr. Monroe tripping backwards (Court File No. 6 Ex. C). Even Plaintiff acknowledges he made physical contact with Dr. Monroe (*id.* Ex. B). In summarily suspending Plaintiff, and upholding the suspension the following day after giving Plaintiff the chance to tell his side of the story, Dr. Twiest was acting pursuant to Erlanger's Medical Staff Bylaw 4.2-1, which authorized summary suspension when a physician's conduct presented a "substantial likelihood of immediate injury or damage to the health or safety of any patient, employee or other person present in the Health System, or to prevent disruption to hospital operation" (*id.* Ex. A). When such situations arise, pre-suspension notice and opportunity to be heard are highly impractical, if not impossible; instead, a hospital satisfies the procedural due process requirements by providing notice and a hearing after the incident takes place. In this case, Erlanger's staff and Dr. Twiest provided the required process after the incident, and Plaintiff had the opportunity to hear the charges against him, offer his version of events, and challenge the suspension. Even if the procedure provided to Plaintiff was imperfect, he still received the critical elements of procedural due process, and "[n]o particular form of procedure is guaranteed by due process of law." *McLaughlin v. Weathers*, 170 F.3d 577, 581 (6th Cir. 1999) (citing *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 610 (1974)).

As for Plaintiff's argument the Court has already found a showing of malice, Plaintiff takes

what the Court said (Court File No. 230, at 11–12) out of context for two reasons. First, the Court was addressing malice in the context of the TPRL to explain why that law did not grant immunity to Erlanger and Dr. Twiest. The Court merely concluded that at the summary judgment stage as to those Defendants, there was a genuine issue of material fact regarding whether malice existed, thus foreclosing the availability of immunity under the (state) TPRL. The Court did not, however, conclusively determine malice existed for all stages of the litigation, including for Plaintiff's (federal) procedural due process claims—only that "there is some evidence to infer malice based upon the facts [that were then] before the Court" (*id.* at 11). Second, the determination of whether malice existed for purposes of the TPRL has little, if anything, to do with the determination of whether Plaintiff received adequate procedural due process. The critical inquiry in the procedural due process analysis is whether Plaintiff received notice and a hearing at the appropriate time—not whether the hospital handled Plaintiff's complaint in an adequate manner, whether Plaintiff was treated differently than other colleagues, or whether he was disproportionately punished. *Eyring v. Fort Sanders Parkwest Med. Ctr.*, 1997 WL 294457, at *7–8 (Tenn. Ct. App. June 4, 1997) (listing the factors for inferring malice under the TPRL). Here, though Plaintiff did not receive notice and a hearing before he was suspended, he was given sufficient post-deprivation notice and an opportunity to be heard and challenge his suspension. Thus, Plaintiff's malice argument, while ostensibly grounded in one of the Court's earlier rulings, is out of place in the federal procedural due process analysis.

For these reasons, the Court finds Plaintiff did not suffer a procedural due process violation, and will grant Defendant's motion for summary judgment on that claim.

### c.    Equal Protection

Plaintiff's Second Amended Complaint alleged a violation of equal protection under the federal Constitution. Defendant moves for summary judgment, arguing Plaintiff has failed to produce evidence a person acting under color of law deprived him of equal protection, and alternatively, the decision to summarily suspend Plaintiff would pass rational-basis scrutiny (Court File No. 311, at 8, *incorporating* Court File No. 313, at 23–24). Plaintiff responds that he fits within a "class of one" equal protection claim, and he has alleged sufficient facts for a claim his equal protection rights were violated (Court File No. 327, at 17–19).

In responding to the motion for summary judgment, Plaintiff claims his "allegations contained in Paragraph 27 of his Second Amended Complaint are sufficient to state a claim" for an equal protection violation (Court File No. 327, at 17). At the summary judgment stage, the non-movant is not entitled to a trial solely on the basis of its allegations. The non-movant must submit significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324. A scintilla of evidence is not enough; the non-movant must present evidence sufficient for a jury to reasonably find for its side. *Liberty Lobby*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). That is, the non-movant bears the burden of coming forward with evidence to establish a genuine issue of material fact, and cannot just rely on what is in the pleadings.

Here, the response to summary judgment on which Plaintiff relies (Court File No. 327) contains no references to depositions, affidavits, letters, or any other evidence beyond what is in the pleadings, to demonstrate a genuine issue that Plaintiff's equal protection rights were violated. It will not do for Plaintiff to rely on a quotation from a Sixth Circuit case: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mayer v. Mylod*, 988 F.2d

37

635, 638 (6th Cir. 1993). As that quotation's language reveals, *Mayer* involved the defendants' motion to dismiss the plaintiff's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). 988 F.2d at 637. Nor will it suffice for Plaintiff to state his allegations mirror those made by the plaintiff in an unreported state case (Court File No. 327, at 18). Here, because the case is at the summary judgment stage, Plaintiff (as the non-movant) bears a greater burden to produce evidence demonstrating a genuine issue of material fact. The fact he has not done so in his response means the Court will grant summary judgment to Defendant on Plaintiff's equal protection claim.

### C. State Constitutional Claims

Defendants argue the Court should grant summary judgment on Plaintiff's state constitutional claims because Tennessee does not recognize a cause of action for violations of the Tennessee Constitution (Court File Nos. 313, 317). Plaintiff has conceded this argument (Court File No. 327, at 16). Because the argument is uncontested, and because it is correct as a matter of law, *see Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n*, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999), the Court will grant Defendants' motion for summary judgment on Plaintiff's Tennessee constitutional claims.

### D. Federal Antitrust Claims

All Defendants except Dr. Monroe argue Plaintiff's federal antitrust claim[10] is barred by the state action doctrine; the Local Government Antitrust Act of 1984, 15 U.S.C. §§ 34–36 ("LGAA"); and because it fails on the merits (Court File Nos. 311, 313, 315). Dr. Monroe argues he is immune under the TPRL and HCQIA (Court File No. 317). Plaintiff responds that the evidence creates a

---

[10]Plaintiff does not state the specific statute under which he brings his federal antitrust claim. The Court has construed his Second Amended Complaint as alleging a conspiracy in restraint of trade, implicating § 1 of the Sherman Act, 15 U.S.C. § 1.

38

genuine issue of material fact regarding whether the Defendants, in revoking Plaintiff's staff privileges, illegally conspired to hinder his medical practice, in restraint of trade (Court File No. 331); that the LGAA does not apply because Defendants were not acting in an official capacity (Court File No. 327); and that the state action does not bar the antitrust claim because there was no statutory authority for Erlanger to restrain trade (*id.*). As to Dr. Monroe, Plaintiff responds there is a genuine issue of material fact regarding whether Dr. Monroe "baited" Plaintiff into the altercation, making him ineligible for immunity under the TPRL and HCQIA (Court File No. 330, at 10–11).

Allegations of antitrust violations are a fairly common thread in cases where physicians challenge privilege decisions made by peer review committees. Because those decisions are made by fellow physicians—and hence, in some cases, competitors in the same practice area—a suspended or excluded physician attempts to introduce evidence showing the privilege decision was made out of an impermissible desire to restrain trade or shut the physician out of practice, rather than out of concerns for patient care or the efficient functioning of a hospital. The Sixth Circuit has further described this trend:

> The early 1980s witnessed a new trend in health care litigation as states and health care accrediting bodies stepped up their promotion of peer review—the process by which physicians judge the competence of their fellow professionals and recommend disciplinary action for those found dangerously incompetent. As this process gathered force, physicians aggrieved by the results of peer review increasingly appeared in federal court claiming that the actions of their peers were anti-competitive and violated federal antitrust laws. Although hospitals and peer review participants generally prevailed in these lawsuits, the victories entailed costly and time-consuming litigation. Congress attempted to remedy this situation in 1986 by enacting the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101–11152.

*Manion v. Evans*, 986 F.2d 1036, 1037 (6th Cir. 1993).

In response to Plaintiff's allegations of antitrust liability, Defendants assert different theories

of immunity. The Court addresses the first of these, immunity under the state action doctrine of the Sherman Act.

Dr. Twiest claims the state action doctrine in antitrust cases, set forth in *Parker v. Brown*, 317 U.S. 341 (1943), immunizes him from Plaintiff's suit because he was employed as Erlanger's Chief Medical Officer when the decision was made to suspend Plaintiff's privileges (Court File No. 311). Drs. Shumaker, Mutter, and Fisher make essentially the same argument, claiming their positions on Erlanger's Medical Executive Committee ("MEC") entitle them to state action immunity (Court File No. 313).[11] However, there is a critical distinction between Dr. Twiest and his colleagues: Dr. Twiest was *employed* by Erlanger as its Chief Medical Officer, while the other physicians, though they were members of a committee at the hospital, were not employed by the hospital but had their own private practices.[12] Thus, the Court will evaluate Dr.Twiest's claim of state action immunity separately from the same claim by Drs. Shumaker, Mutter, and Fisher.

### a.    Dr. Twiest

Antitrust laws do not reach political subdivisions of states when they act pursuant to a "clearly expressed state policy." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 40 (1985). In this case, Defendant Dr. Twiest has stated the protection from federal antitrust laws enjoyed by Erlanger extends to him because he "was acting pursuant to a clearly expressed state policy which authorizes Erlanger to appoint officers, hire employees and regulate hospital privileges" (Court File

---

[11]Dr. Shumaker was Secretary of the Medical Staff and a member of the Medical Executive Committee when the underlying events took place (Court File No. 315, at 1). Dr. Fisher was Chief of the Medical Staff at the time (*id.*). Dr. Mutter was Vice Chief of the Medical Staff at the time (*id.* at 2).

[12]The parties do not dispute that Erlanger is a state entity. *Ketron v. Chattanooga-Hamilton County Hosp. Auth.*, 919 F. Supp. 280, 283 (E.D. Tenn. 1996).

40

No. 311, at 9).

Plaintiff does not respond to this argument. Instead, Plaintiff argues there is a genuine issue of material fact about whether Defendants, including Dr. Twiest, conspired to restrain Plaintiff's practice in revoking his privileges (Court File No. 331). Plaintiff's response, however, is an argument about the *merits* of the antitrust claim, and does not address Dr. Twiest's *immunity* argument. Plaintiff has the burden, as the non-moving party at the summary judgment stage, to put forth evidence showing a genuine issue of material fact as to Dr. Twiest's status as a state actor—that is, challenging Dr. Twiest's argument he enjoys antitrust immunity. *Celotex*, 477 U.S. at 324. Plaintiff has not done so, and the Court will not sift through the record trying to find any such evidence for Plaintiff. *Williamson*, 481 F.3d at 379. Accordingly, the Court finds Dr. Twiest was acting as an agent of Erlanger, pursuant to a clearly expressed state policy, when he approved the decision to summarily suspend Plaintiff. The Court thus finds Dr. Twiest is immune from antitrust liability under the state action doctrine.

### b.      Drs. Shumaker, Mutter, and Fisher

In the memorandum supporting their motion for summary judgment (Court File No. 313, at 16–18), Drs. Shumaker, Mutter, and Fisher argue they are entitled to state action immunity under *Parker* because they were "state officials" who each held positions on Erlanger's MEC at the time of the suspension, and were permissibly regulating a physician's privileges under Tenn. Code Ann. § 7-57-301(16) (granting hospital authorities the power to "[d]etermine and regulate the conditions under which the privilege of practicing within any hospital operated by the authority may be available to physicians, and promulgate reasonable rules and regulations governing the conduct of physicians and nurses while on duty in the hospital").

However, these three physicians were not *employees* of Erlanger. Instead, they had their own private practices, were admitted to practice at Erlanger, and served on its MEC. The mere fact a private actor serves on a committee of a state entity does not transform that person into a state actor, immune from liability.[13] *See Patrick v. Burget*, 486 U.S. 94 (1988). *Patrick* concluded suspension of privileges by a hospital peer review committee's members did not exempt those members from antitrust liability under the state action doctrine, because there was no active state supervision of the peer review process which was conducted by private actors, as required by *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980). *See also Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 536 (6th Cir. 2002) ("[T]o assert a *Parker* defense successfully, private parties must establish both a clearly articulated state policy to authorize anticompetitive conduct and active state supervision of private anticompetitive conduct.").

"[T]he active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct." *Patrick*, 486 U.S. at 101. Where a court can find nothing in state law to indicate the state is actively supervising a hospital authority's peer review committee, the actions of that committee's members do not qualify for antitrust immunity. *See id.* at 101–03. The Court can find no such Tennessee law in the instant case.

Other courts, however, have distinguished *Patrick* by holding that when medical staff members of a government-operated hospital make recommendations regarding hospital privileges, they do so as agents of the hospital authority, which may effectively make them political subdivisions immune from liability under the state action doctrine. *See Crosby v. Hosp. Auth. of*

---

[13]The Court is mindful that the "*Parker* antitrust immunity inquiry is different than the inquiry into whether state action exists for the purposes of § 1983 and the Fourteenth Amendment." *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 442 F.3d 410, 440 (6th Cir. 2006).

*Valdosta & Lowndes County*, 93 F.3d 1515, 1529 (11th Cir. 1996) ("[S]taff physicians may in certain contexts be agents of the hospital for purposes of state action immunity."); *Cohn v. Bond*, 953 F.2d 154, 157–58 (4th Cir. 1991) ("When members of the medical staff recommend action on an application for privileges, as authorized by the municipal hospital, they are acting in their capacity as employees, as opposed to private parties.  Physicians who make peer review decisions at the behest of, or by delegation from, the hospital's board of trustees, are acting as agents of the hospital and are, therefore, indistinguishable from the hospital.").  The *Cohn* court concluded that because the physicians on the medical staff were agents of the hospital when they made staff privilege recommendations, the "active supervision" prong did not apply.  953 F.2d at 158–59.  However, the Eleventh Circuit has denied state action immunity based on agency principles where physicians on a medical staff acted as separate economic actors, and their actions were therefore distinct from their hospital's actions.  *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1446 n.13 (11th Cir. 1991).

Thus, the question for the Court is whether, by virtue of their membership on the MEC, an arm of a state entity, these physicians acted as Erlanger's agents (not as completely separate legal entities) for purposes of the Sherman Act's state action immunity.  The *Crosby* court addressed this determination in the context of the policies underlying the state action doctrine.  93 F.3d at 1530.  The court relied on the Supreme Court's holding in *Town of Hallie*, 471 U.S. at 47, which "distinguished between actions by political subdivisions, which are presumptively intended to further governmental interests if undertaken pursuant to clearly articulated state policy, and actions by private parties, which are presumptively intended to further private interests."  93 F.3d at 1530.  The critical issue in the Eleventh Circuit's analysis was "whether the nexus between the State and

43

the actions of the doctors on peer review committees is sufficiently strong that there is little real danger that [the] doctors are involved in a *private* price-fixing arrangement." *Id.* Based on the hospital authority's control over all staff credentialing decisions, and on the state statutory scheme's recognition that physicians work as both "independent contractors" and as part of a hospital's management structure, the Eleventh Circuit concluded there was little danger of a private price fixing arrangement, and thus the individual peer review committee members were immune because they were acting as the hospital's agents. *Id.* at 1531–32.

In this case, the Tennessee statutory scheme, like the Georgia scheme in *Crosby*, strongly indicates the state legislature intended hospital authorities to retain final control over physician credentialing decisions. The Private Act Hospital Authority Act of 1996 empowers hospital authorities like Erlanger to "regulate the conditions under which the privilege of practicing within any hospital operated by the authority may be available to physicians." Tenn. Code Ann. § 7-57-301(16). Erlanger has the ability to appoint officers and hire employees under the Act. *Id.* § 7-57-301(9). The Act makes no provision for delegating this final role to medical committees comprised of physicians, even though those committees may receive deference in their credentialing recommendations. The Sixth Circuit has confirmed that "the Tennessee legislature invested public hospital corporations with very broad powers to ensure their continued viability . . .[which] could be undertaken without regard to the effects of such activity on competition." *Jackson, Tenn. Hosp. Co. v. W. Tenn. Healthcare, Inc.*, 414 F.3d 608, 614 (6th Cir. 2005).

The Erlanger Bylaws contemplate that final control of credentialing decisions, especially those having to do with a physician's suspension, rests in the hospital's hands and not the MEC's. *See* Erlanger Bylaws pmbl. (Court File No. 6 Ex. A) ("The medical staff of Erlanger Health System

44

recognizes the ultimate authority for the operation of the Health System lies with the board of trustees of the Chattanooga-Hamilton County Hospital Authority."); *id.* § 4.2-4 ("The terms of the summary suspension as originally imposed [by the MEC] shall remain in effect *pending a final decision by the board* [of trustees].") (emphasis added); *id.* §4.6 (providing hearing procedures, when a physician's membership is suspended or revoked, for the MEC to make recommendations to a board-appointed panel). In this case, the MEC suspended Plaintiff, but ultimately it was Dr. Twiest —an employee of Erlanger, not just an MEC member —who, after giving Plaintiff an opportunity to explain his side of the story, upheld the suspension (Court File No. 312 Ex. E (Twiest dep. p. 180)). Dr. Twiest was free to disregard the MEC's recommendation, but chose not to. The Court cannot conclude, from the structure of the medical staff bylaws or how they were implemented in this case, that the physicians on the medical staff were independent economic actors who conspired to restrict Plaintiff's trade. Instead, those physicians acted as agents of the hospital in making a recommendation to Erlanger's chief of medical staff, which Dr. Twiest followed. Since this was a case of the hospital acting through its agents on the MEC, as in *Crosby*, the Court concludes Drs. Shumaker, Mutter, and Fisher are entitled to immunity under the state action doctrine of the Sherman Act.

Accordingly, the Court will grant the motions for summary judgment of Dr. Twiest and of Drs. Shumaker, Mutter, and Fisher. Because the Court dismisses these Defendants from Plaintiff's antitrust claims on immunity grounds, the Court does not reach the merits of those claims, or the Defendants' other arguments for immunity.

Lastly, Defendant Erlanger has not filed a motion for summary judgment. However, Plaintiff's Second Amended Complaint states the same claims against Erlanger as it does against

the individual Defendants, and alleges Erlanger participated in the same conduct as those Defendants. A district court may grant summary judgment sua sponte as long as the losing party had "notice that the court was considering summary judgment on the claim, as well as a reasonable opportunity to present its arguments and evidence on the claim." *Aubin Indus., Inc. v. Smith*, 2008 WL 4963201, at *1 (6th Cir. Nov. 20, 2008) (unpublished opinion) (citing *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995)). The Sixth Circuit will reverse sua sponte grants of summary judgment where they are based on grounds not raised by the moving party. *See Transition Healthcare Assocs., Inc. v. Tri-State Health Investors, LLC*, 2009 WL 67869, at *5 (6th Cir. Jan. 9, 2009) (unpublished opinion). Here, Plaintiff had notice of the consideration of summary judgment, as well as an opportunity to respond, because Plaintiff did in fact respond to four motions for summary judgment addressing the exact same claims he alleged in his Second Amended Complaint.

In view of the foregoing law and facts, the Court will also grant summary judgment in favor of Erlanger and dismiss it from this lawsuit.

### E.     State Law Claims

At this point, the Court has dismissed Dr. Monroe from the suit, has granted summary judgment to Defendants on Plaintiff's federal constitutional and antitrust claims, and has found various remaining claims time-barred by the applicable statutes of limitation. The only remaining claims on which Defendants have moved for summary judgment are Plaintiff's state law claims in his Second Amended Complaint: state antitrust violations, breach of contract, business torts, and a state conspiracy claim.

A district court may decline to exercise supplemental jurisdiction when it "has dismissed all

claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Having dismissed all of Plaintiff's claims that were removed based on federal question jurisdiction, the Court declines to exercise jurisdiction over Plaintiff's remaining state law claims. The Court will remand those claims to state court.


V.      **CONCLUSION**

For the foregoing reasons, the Court will **GRANT IN PART** Defendants' motion to dismiss as to all but Plaintiff's antitrust claims, and will **DISMISS** those claims against those Defendants. In addition, the Court will **GRANT** Defendants' motions for summary judgment and will **DISMISS** Plaintiff's claims against Defendants. The Court will **REMAND** the remaining state law claims to state court.

An Order will enter.


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**